We are here to receive the Court of Interest Crites, who have built a very fresh narrative since their opening. We have the plaintiff, Alex, and we have the defendant, Anderson. And at this time, I will pass the floor over to the judges and the defendants for your briefings. Your Honor, on the one hand, this case presents a rather mundane question of interracial interrogation. The court immediately notified the court of the court order for interrogation. But on the other hand, it seems to imagine that the issue are two very, very important issues for claims of terrorist matters and non-terrorist matters all across the country. The first is, the world seems to have a better place. When people who are able to work, even just among themselves, are able to do so. The true subject of community accommodations is important. And courts always have and continue to do that here. Second, the court should not accept such an expectation as being robed with the country's possible answers and reasonable expectations, which apply to the interpretation of insurance contracts and criminal case decisions as well. Thank you. Benjamin Anderson is a 16-year-old career operating room nurse who, in 2008, suffered a career-ending injury. She refers to it as a warhead. She was never able to recover enough brachial motion or strength in her arms to do that. The materials against the operating room nurse suffering in the case She just was trying to destiny, but it wasn't until December that, I guess, she determined that she could no longer work as a surgeon when her season started with the injury. Yes. She had a career-ending injury. She died in 2008. She was often seized. Her recovery was 2009. What was the subject of the case? I didn't figure out. It was a case that came down incidentally for insurance purposes once in December in 2008, even though she suffered the original injury and tried to just prove that it was not a career-ending injury. Under these select policy conditions, there'll be a student that's going to have to leave a fiscal investment and a super-loss income because, as I understand this, the employer wanted to give her time to heal, so she returned to the operating room. They were requiring a compounding physician at first, and then something that's called a discharge patient, which is a mix of an operating room and a discharge patient, because she couldn't work as a surgical nurse when she went to that video and that television video. That's right. That's right. Can you share some highlights about what happened to her? There's a clean-up together. Full day, that's right, starting April. It's normalized. It's an exterminated patient. She's in a satisfactory position, but she still received full day. And the hospital is analyzing that to see whether the change she was performing continued to influence some nursing functions. It's August 2009. Her husband said, Nursing functions are now, you think it is over, you think it's great. Now that any position is over, it's normal to continue working as a telephone service patient. Since that's true, you get paid a little job, but it's not $39. You don't get any more than $12. At that point, she was eligible to apply for long-term disability benefits under the school policy, which did try to apply for both short-term and long-term disability benefits under the school policy. So they only acknowledged the short-term disability application, which it denied. It denied it not on the basis that she wasn't a nurse, but on the basis that this was short-term from the policy and 6,000 for our injuries. But in some life's crime records for the short-term application, you recognize that she was an operating room nurse. You recognize that her rate of pay was $39 an hour. You recognize that she was eligible for long-term disability benefits. But despite the fact that nurse Anderson was continuously asking someone to process the long-term disability benefits, I mean, it's hard to believe the work that was done in place by the secretary's primary condition, whose life's reduced to knowledge, her repeated invocations of her rights to long-term disability, rendered it deemed to not have long-term benefits at that time. The second thing is that, you know, that's the same thing that you're arguing about. At what point did they announce to you that she was just a fire and she wasn't eligible for long-term disability benefits when they announced it to you? They had not mentioned it on fire. They had no mention of it on fire. And the workplace increase was that they were applying to the short-term claim didn't apply to the long-term claim. And a number of other things that we have highlighted in the briefs. The court doesn't even need to reach. The question of fiduciary increases is the court increases the amount by which a person's usual customary employment, business, trade, professional vocation, and employee performance is generally recognized in the nation's economy to be equal to the percentage of a person with disability. The court agrees that that amount can be used in a particular court. Applying the doctrine of short-term coverage is not incorrect. The court doesn't need to reach. The question of fiduciary increases Why do you believe in a policy if she suffered the injury in July of 2008 and by December in the term that she was interviewed that she could return? Why did she make the point that she didn't deserve the coverage? Well, the court's response is that by December of 2008, there's the understanding that she could not return. She couldn't return at that point. But she didn't solve the issue. The court doesn't believe in a policy since months since she suffered the injury. Could she have made a case of not supposed to be treated for a long-term disability that doesn't even involve suicide? I don't know the specific terms of the end of the policy, but as of December 31, 2008, there's the understanding that she could not spend it. There's the understanding now that I assume there's a chance that she can come back in some form of a payment policy for a long-term disability. We understand that the end of the policy was in July of 2010, so we don't know what's in place to keep her in the community for a number of months. We don't know how long it will take for her to understand that. But the bare point, Your Honor, is that that question goes to the continuity of coverage during Michigan City within the substance of the policy. We don't know the period of continuity of coverage. Again, the district court specifically found that the end of the policy under that language, the language, the statement of purpose in that provision, the insurance condition specifically, says it's there to protect employees from falling through the cracks during the change in coverage within the substance of the policy. Is that correct? Exactly, Your Honor. The last point that we'd like to make is that the employer in his role has made clear that administrators are even more competent to play for their employees. This session is up to me. I'm not sure if I'm going to speak to this, Your Honor. My question is, Your Honor, is there a line between fear and spying on us? This court has clearly revealed that the need for an administrator is always present. I think that's a good thing because we're going to go to the money for benefits. Yes, Your Honor. All of that's going to go to the CHS, the employer, and it's going to be that individual that wants to determine how many employees are going to get to a role under a risk. He didn't do anything wrong under a risk because he is the main plan administrator with the power to determine who the plan administrator is. The power is higher in higher insurance companies. Your Honor, do you think that there are any benefits that could be generated through the cost of that? Is there any benefit that could be generated to pay for all these costs that people are going to be spending so much on? Is it not a negative and a negative to the employer in their own actions that they need more benefits for themselves? That's not true, Your Honor. There's no claim here in the CHS. This is all on the people and the benefits themselves. Yes, there are conservative and conservative regulations which are involved in CHS. CHS is the one agency that is responsible for the program. That's not what it is, Your Honor. There's no monetary play with it, Your Honor. I'm asking for the plan as an administrator. I'm asking for the plan as an administrator. Yes, Your Honor. CHS has the name of  transactional plan administrator who is responsible for making sure that the plan has cost-expunging responses and that the special monitoring team on behalf of the special monitoring team is responsible for making sure that the plan  cost-expunging that the plan cost-expunging responses and that plan will be in front of any person that has a stronger interest in fillling this gap. I will  in front of any person that has a stronger interest in filling this gap. I will be in front in front of any  that has a stronger front of any person  has a stronger interest
judges: McKeown, Wardlaw, Tallman